Brett E. Lewis (BL-6812)
brett@iLawco.com
Justin Mercer (JM-4514)
justin@iLawco.com
LEWIS & LIN, LLC
81 Prospect Street, Suite 8001
Brooklyn, NY 11201
Tel: (718) 243-9323
Fax: (718) 243-9326

*Counsel for Defendants*

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| ABH NATURE'S PRODUCTS, INC. and ABH PHARMA, INC.,<br><br>Plaintiffs,<br><br>v.<br><br>SUPPLEMENT MANUFACTURING PARTNER, INC. d/b/a/ SMP NUTRA, FUTURE PACK FULFILLMENT, INC., JOSEPH IMPERIO, alias FRANK CANTONE, STEVEN MILANO, WILLIAM CARTWRIGHT and JOHN DOES NOS. 1-10,<br><br>Defendants. | Case No. 2:19-cv-05637-LDH-RLM<br><br><br>**ANSWER AND COUNTERCLAIMS** |
| SUPPLEMENT MANUFACTURING PARTNER, INC. d/b/a/ SMP NUTRA, and JOSEPH IMPERIO, alias FRANK CANTONE,<br><br>Counterclaimants,<br><br>v.<br><br>JAHIRUL ISLAM, and ABH NATURE'S PRODUCTS, INC.,<br><br>Counterdefendants. | |

i

Defendants Supplement Manufacturing Partner, Inc. d/b/a/ SMP Nutra ("SMP"), Future Pack Fulfillment, Inc. ("Future Pack"), Joseph Imperio a/k/a Frank Cantone ("Imperio"), Steven Milano ("Milano"), and William Cartwright ("Cartwright"), through their undersigned counsel, Lewis & Lin LLC, hereby answer the Complaint of Plaintiffs ABH Nature's Products, Inc. ("Nature") and ABH Pharma, Inc. ("Pharma") (collectively, "Plaintiffs"):

1.     Admit the Complaint purports to be an action for the causes so enumerated in Paragraph 1. Admit Nature manufactures nutraceuticals and health supplements for sale to customers throughout the United States and abroad. Admit Pharma used to market, sell and distribute the products to such customers. Except as admitted, deny the allegations set forth in Paragraph 1 of the Complaint.

2.     Deny the allegations set forth in Paragraph 2 of the Complaint.

3.     Deny the allegations set forth in Paragraph 3 of the Complaint.

4.     Deny the allegations set forth in Paragraph 4 of the Complaint.

5.     Admit that Nature sent a letter dated August 16, 2019. To the extent the allegations of Paragraph 5 seek to paraphrase the contents of a written document, the document speaks for itself and deny allegations to the extent they are inconsistent with that document.

**6.**     Admit that Plaintiffs purport to seek the damages and redresses enumerated in Paragraph 6.  Except as expressly admitted, deny the allegations set forth in Paragraph 6 of the Complaint.

## JURISDICTION AND VENUE

7.     Paragraph 7 contains legal conclusions to which no response is required; to the extent it is required, deny the allegations set forth in Paragraph 7.

8.      Paragraph 8 contains legal conclusions to which no response is required; to the extent it is required, deny the allegations set forth in Paragraph 8 of the Complaint.

9.      Deny the allegations set forth in Paragraph 9 of the Complaint

## ALLEGATIONS COMMON TO PLAINTIFF'S CLAIMS

10.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 10 of the Complaint.

11.     Admitted.

12.     Admitted.

13.     Admitted.

14.     Admitted that Joseph Imperio is a resident of the State of New York.  Except as admitted, Defendants deny the allegations set forth in paragraph 14 of the Complaint.

15.     Admitted.

16.     Admitted.

17.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 17 of the Complaint.

18.     Deny the allegations set forth in Paragraph 18 of the Complaint.

19.     Deny the allegations set forth in Paragraph 19 of the Complaint.

20.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 20 of the Complaint.

21.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 21 of the Complaint.

22.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 22 of the Complaint.

23.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 23 of the Complaint.

24.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 24 of the Complaint.

25.     Admitted.

26.     Admitted.

27.     Deny the allegations set forth in Paragraph 27 of the Complaint.

28.     Admitted.

29.     Admitted.

30.     Deny the allegations set forth in Paragraph 30 of the Complaint.

31.     Admitted.

32.     Deny the allegations set forth in Paragraph 32 of the Complaint.

33.     Deny the allegations set forth in Paragraph 33 of the Complaint.

34.     Deny the allegations set forth in Paragraph 34 of the Complaint.

35.     Deny the allegations set forth in Paragraph 35 of the Complaint.

36.     Deny the allegations set forth in Paragraph 36 of the Complaint.

37.     Deny the allegations set forth in Paragraph 37 of the Complaint.

38.     Deny the allegations set forth in Paragraph 38 of the Complaint.

39.     Deny the allegations set forth in Paragraph 39 of the Complaint.

40.     Deny the allegations set forth in Paragraph 40 of the Complaint, except to affirmatively state that Nature could not keep up with the orders generated by Imperio and Pharma, and that Nature's production delays caused numerous customer complaints and resulted in millions of dollars in orders to go unfilled.

41.     Deny the allegations set forth in Paragraph 41 of the Complaint.

42.     Deny the allegations set forth in Paragraph 42 of the Complaint.

43.     Deny the allegations set forth in Paragraph 43 of the Complaint.

44.     Deny the allegations set forth in Paragraph 44 of the Complaint.

45.     Deny the allegations set forth in Paragraph 45 of the Complaint.

46.     Deny the allegations set forth in Paragraph 46 of the Complaint.

47.     Deny the allegations set forth in Paragraph 47 of the Complaint.

48.     Deny the allegations set forth in Paragraph 48 of the Complaint.

49.     Deny the allegations set forth in Paragraph 49 of the Complaint.

50.     Deny the allegations set forth in Paragraph 50 of the Complaint.

51.     Deny the allegations set forth in Paragraph 51 of the Complaint.

52.     Deny the allegations set forth in Paragraph 52 of the Complaint.

53.     Deny the allegations set forth in Paragraph 53 of the Complaint.

54.     Deny the allegations set forth in Paragraph 54 of the Complaint.

55.     Deny the allegations set forth in Paragraph 55 of the Complaint, except admit the existence of the draft Consent Decree.

56.     Deny the allegations set forth in Paragraph 56 of the Complaint.

57.     Deny the allegations set forth in Paragraph 57 of the Complaint.

58.     Admit that Defendant Imperio wrote the email to Wellness Creations. Except as admitted, deny the allegations set forth in Paragraph 58 of the Complaint.

59.     Deny the allegations set forth in Paragraph 59 of the Complaint.

60.     Deny the allegations set forth in Paragraph 60 of the Complaint.

61.     Deny the allegations set forth in Paragraph 61 of the Complaint.

62.    Deny the allegations set forth in Paragraph 62 of the Complaint.

63.    Deny the allegations set forth in Paragraph 63 of the Complaint.

64.    Deny the allegations set forth in Paragraph 64 of the Complaint.

65.    Deny the allegations set forth in Paragraph 65 of the Complaint.

66.    Deny the allegations set forth in Paragraph 66 of the Complaint.

67.    Deny the allegations set forth in Paragraph 67 of the Complaint.

68.    Deny the allegations set forth in Paragraph 68 of the Complaint.

69.    Deny the allegations set forth in Paragraph 69 of the Complaint.

70.    Deny the allegations set forth in Paragraph 70 of the Complaint.

71.    Deny the allegations set forth in Paragraph 71 of the Complaint.

72.    Admitted.

73.    Admitted.

74.    Admitted.

75.    Admitted.

76.    Deny the allegations set forth in Paragraph 76 of the Complaint.

77.    Deny the allegations set forth in Paragraph 77 of the Complaint.

78.    Deny the allegations set forth in Paragraph 78 of the Complaint.

79.    Deny the allegations set forth in Paragraph 79 of the Complaint.

80.    Deny the allegations set forth in Paragraph 80 of the Complaint.

81.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 81 of the Complaint.

82.    Deny the allegations set forth in Paragraph 82 of the Complaint.

83.    Deny the allegations set forth in Paragraph 83 of the Complaint.

84.     Deny the allegations set forth in Paragraph 84 of the Complaint.

85.     Deny the allegations set forth in Paragraph 85 of the Complaint.

86.     Deny the allegations set forth in Paragraph 86 of the Complaint.

87.     Deny the allegations set forth in Paragraph 87 of the Complaint.

88.     Deny the allegations set forth in Paragraph 88 of the Complaint.

89.     Deny the allegations set forth in Paragraph 89 of the Complaint.

90.     Deny the allegations set forth in Paragraph 90 of the Complaint.

91.     Deny the allegations set forth in Paragraph 91 of the Complaint.

92.     Deny the allegations set forth in Paragraph 92 of the Complaint.

93.     Deny the allegations set forth in Paragraph 93 of the Complaint.

94.     Deny the allegations set forth in Paragraph 94 of the Complaint.

95.     Deny the allegations set forth in Paragraph 95 of the Complaint.

96.     Deny the allegations set forth in Paragraph 96 of the Complaint.

97.     Deny the allegations set forth in Paragraph 97 of the Complaint.

98.     Deny the allegations set forth in Paragraph 98 of the Complaint.

99.     Deny the allegations set forth in Paragraph 99 of the Complaint.

100.    Deny knowledge or information sufficient to form a belief as to the truth of the
allegation set forth in Paragraph 100 of the Complaint.

101.    Deny the allegations set forth in Paragraph 101 of the Complaint.

102.    Deny the allegations set forth in Paragraph 102 of the Complaint.

103.    Deny the allegations set forth in Paragraph 103 of the Complaint.

104.     To the extent that Paragraph 104 seeks to paraphrase the contents of the Letter dated August 16, 2019, the Letter speaks for itself and Defendant denies the allegations to the extent that they are inconsistent with the document.

105.     Deny the allegations set forth in Paragraph 105 of the Complaint.

106.     Deny the allegations set forth in Paragraph 106 of the Complaint.

## COUNT 1
### (False Designation of Origin, False Advertising, and Unfair Competition)

107.     Restate and incorporate by reference the responses contained in all preceding paragraphs as if set forth here in full.

108.     Deny the allegations set forth in Paragraph 108 of the Complaint.

109.     Deny the allegations set forth in Paragraph 109 of the Complaint.

110.     Deny the allegations set forth in Paragraph 110 of the Complaint.

111.     Deny the allegations set forth in Paragraph 111 of the Complaint.

112.     Deny the allegations set forth in Paragraph 112 of the Complaint.

113.     Deny the allegations set forth in Paragraph 113 of the Complaint.

114.     Deny the allegations set forth in Paragraph 114 of the Complaint.

115.     Deny the allegations set forth in Paragraph 115 of the Complaint.

## COUNT II
### Common Law Trademark Infringement

116.     Restate and incorporate by reference the responses contained in all preceding paragraphs as if set forth here in full.

117.     Deny the allegations set forth in Paragraph 117 of the Complaint.

118.     Deny the allegations set forth in Paragraph 118 of the Complaint.

119.     Deny the allegations set forth in Paragraph 119 of the Complaint.

120.     Deny the allegations set forth in Paragraph 120 of the Complaint.

121.     Deny the allegations set forth in Paragraph 121 of the Complaint.

122.     Deny the allegations set forth in Paragraph 122 of the Complaint.

123.     Deny the allegations set forth in Paragraph 123 of the Complaint.

**COUNT III**
**Common Law Unfair Competition**

124.     Restate and incorporate by reference the responses contained in all preceding paragraphs as if set forth here in full.

125.     Deny the allegations set forth in Paragraph 125 of the Complaint.

126.     Deny the allegations set forth in Paragraph 126 of the Complaint.

127.     Deny the allegations set forth in Paragraph 127 of the Complaint.

128.     Deny the allegations set forth in Paragraph 128 of the Complaint.

129.     Deny the allegations set forth in Paragraph 129 of the Complaint.

130.     Deny the allegations set forth in Paragraph 130 of the Complaint.

**COUNT IV**
**Declaratory Judgment**

131.     Restate and incorporate by reference the responses contained in all preceding paragraphs as if set forth here in full.

132.     Deny the allegations set forth in Paragraph 132 of the Complaint.

133.     Deny the allegations set forth in Paragraph 133 of the Complaint.

134.     Deny the allegations set forth in Paragraph 134 of the Complaint.

**COUNT V**
**Breach of Fiduciary Duty and Implied Covenant of Good Faith and Fair Dealing**

135.     Restate and incorporate by reference the responses contained in all preceding paragraphs as if set forth here in full.

ix

136.    Deny the allegations set forth in Paragraph 136 of the Complaint.

137.    Deny the allegations set forth in Paragraph 137 of the Complaint.

138.    Deny the allegations set forth in Paragraph 138 of the Complaint.

139.    Deny the allegations set forth in Paragraph 139 of the Complaint.

## COUNT VI
### Unjust Enrichment

140.    Restate and incorporate by reference the responses contained in all preceding paragraphs as if set forth here in full.

141.    Deny the allegations set forth in Paragraph 141 of the Complaint.

142.    Deny the allegations set forth in Paragraph 142 of the Complaint.

## COUNT VII
### Constructive Trust

143.    Restate and incorporate by reference the responses contained in all preceding paragraphs as if set forth here in full.

144.    Deny the allegations set forth in Paragraph 144 of the Complaint.

145.    Deny the allegations set forth in Paragraph 145 of the Complaint.

146.    Deny the allegations set forth in Paragraph 146 of the Complaint.

147.    Deny the allegations set forth in Paragraph 147 of the Complaint.

## COUNT VIII
### Breach of Duty of Loyalty

148.    Restate and incorporate by reference the responses contained in all preceding paragraphs as if set forth here in full.

149.    Deny the allegations set forth in Paragraph 149 of the Complaint.

150.    Deny the allegations set forth in Paragraph 150 of the Complaint.

151.    Deny the allegations set forth in Paragraph 151 of the Complaint.

152.    Deny the allegations set forth in Paragraph 152 of the Complaint.

**COUNT IX**
**Violation BCL Section 720**

153.    Restate and incorporate by reference the responses contained in all preceding paragraphs as if set forth here in full.

154.    Deny the allegations set forth in Paragraph 154 of the Complaint.

155.    Deny the allegations set forth in Paragraph 155 of the Complaint.

156.    Deny the allegations set forth in Paragraph 156 of the Complaint.

157.    Deny the allegations set forth in Paragraph 157 of the Complaint.

**COUNT X**
**Defamation and Trade Libel**

158.    Restate and incorporate by reference the responses contained in all preceding paragraphs as if set forth here in full.

159.    Deny the allegations set forth in Paragraph 159 of the Complaint.

160.    Deny the allegations set forth in Paragraph 160 of the Complaint.

161.    Deny the allegations set forth in Paragraph 161 of the Complaint.

162.    Deny the allegations set forth in Paragraph 162 of the Complaint.

163.    Deny the allegations set forth in Paragraph 163 of the Complaint.

164.    Deny the allegations set forth in Paragraph 164 of the Complaint.

165.    Deny the allegations set forth in Paragraph 165 of the Complaint.

166.    Deny the allegations set forth in Paragraph 166 of the Complaint.

**COUNT XI**
**(Tortious Interference with Contract, Existing and Prospective Business Relationships**

167.    Restate and incorporate by reference the responses contained in all preceding paragraphs as if set forth here in full.

168.     Deny the allegations set forth in Paragraph 168 of the Complaint.

169.     Deny the allegations set forth in Paragraph 169 of the Complaint.

170.     Deny the allegations set forth in Paragraph 170 of the Complaint.

171.     Deny the allegations set forth in Paragraph 171 of the Complaint.

172.     Deny the allegations set forth in Paragraph 172 of the Complaint.

173.     Deny the allegations set forth in Paragraph 173 of the Complaint.

## COUNT XII
## Violation of Section 349 of the General Business Law

174.     Restate and incorporate by reference the responses contained in all preceding paragraphs as if set forth here in full.

175.     Deny the allegations set forth in Paragraph 175 of the Complaint.

176.     Deny the allegations set forth in Paragraph 176 of the Complaint.

177.     Deny the allegations set forth in Paragraph 177 of the Complaint.

178.     Deny the allegations set forth in Paragraph 178 of the Complaint.

179.     Deny the allegations set forth in Paragraph 179 of the Complaint.

180.     Deny the allegations set forth in Paragraph 180 of the Complaint.

181.     Deny the allegations set forth in Paragraph 181 of the Complaint.

182.     Deny the allegations set forth in Paragraph 182 of the Complaint.

## COUNT XIII
## Conversion

183.     Restate and incorporate by reference the responses contained in all preceding paragraphs as if set forth here in full.

184.     Deny the allegations set forth in Paragraph 184 of the Complaint.

185.     Deny the allegations set forth in Paragraph 185 of the Complaint.

186.    Deny the allegations set forth in Paragraph 186 of the Complaint.

## COUNT XIV
## Breach of Contract

187.    Restate and incorporate by reference the responses contained in all preceding paragraphs as if set forth here in full.

188.    Deny the allegations set forth in Paragraph 188 of the Complaint.

189.    Deny the allegations set forth in Paragraph 189 of the Complaint.

190.    Deny the allegations set forth in Paragraph 190 of the Complaint.

191.    Deny the allegations set forth in Paragraph 191 of the Complaint.

192.    Deny the allegations set forth in Paragraph 192 of the Complaint.

193.    Deny the allegations set forth in Paragraph 193 of the Complaint.

194.    Deny the allegations set forth in Paragraph 194 of the Complaint.

## COUNT XV
## Violation of the Federal Computer Fraud and Abuse Act

**195.**    Restate and incorporate by reference the responses contained in all preceding paragraphs as if set forth here in full.

**196.**    Deny the allegations set forth in Paragraph 196 of the Complaint.

**197.**    Deny the allegations set forth in Paragraph 197 of the Complaint.

**198.**    Deny the allegations set forth in Paragraph 198 of the Complaint.

**199.**    Deny the allegations set forth in Paragraph 199 of the Complaint.

**200.**    Deny the allegations set forth in Paragraph 200 of the Complaint.

**201.**    Deny the allegations set forth in Paragraph 201 of the Complaint.

**202.**    Deny the allegations set forth in Paragraph 202 of the Complaint.

**203.**    Deny the allegations set forth in Paragraph 203 of the Complaint.

## COUNT XVI
## Injunctive Relief

204.    Restate and incorporate by reference the responses contained in all preceding

paragraphs as if set forth here in full.

205.    Deny the allegations set forth in Paragraph 205 of the Complaint.

206.    Deny the allegations set forth in Paragraph 206 of the Complaint.

207.    Deny the allegations set forth in Paragraph 207 of the Complaint.

208.    Deny the allegations set forth in Paragraph 208 of the Complaint.

209.    Deny the allegations set forth in Paragraph 209 of the Complaint.

210.    Deny the allegations set forth in Paragraph 210 of the Complaint.

## AFFIRMATIVE DEFENSES

1.    Plaintiffs' Complaint fails to state a claim on which relief may be granted.

2.    Plaintiffs' claims are barred by Laches.  Plaintiffs waited more than three years in

some cases to assert a cause of action.

3.    Plaintiffs' claims are barred, in whole or in part, by the doctrine of unclean hands.

Plaintiffs engaged in a fraudulent scheme to steal Mr. Imperio's shares in Pharma, and

knowingly and intentionally operated a business in violation of multiple FDA regulations.

4.    Plaintiffs' claims are barred, in whole or in part, by the doctrines of acquiescence,

waiver, release, consent, ratification, estoppel, and excuse.  Plaintiffs acquiesced and consented

in Defendants operating a competing business.

5.    Plaintiffs' claims are barred because of a lack of capacity sue.  Disputes exist over

the ownership of Pharma.

6.      Plaintiffs' claims are barred, in whole or in part, by a lack of standing to sue. Islam failed to serve a demand to sue on the board of Pharma.  Additionally, neither Pharma nor Nature is listed as a party to the non-compete agreements.

7.      Plaintiffs' damages, if any, were caused in whole or in part by Plaintiff's own acts, omissions, and/or negligent conduct.  Plaintiffs engaged in a bad faith scheme to steal Mr. Imperio's ownership interests in Pharma and Pharma's assets.  Any damages suffered by Plaintiffs resulted directly from their own wrongful conduct.

8.      To the extent that Plaintiffs suffered any damages, Plaintiffs failed to mitigate such damages.  Plaintiffs could have, at any time, returned Mr. Imperio's shares to him, and honored their agreements.  Similarly, Plaintiffs had six months to comply with the terms of the FDA's proposed Consent Decree before they were ultimately shut down.

9.      Plaintiffs Islam and Nature played no role in sales, marketing, or developing customers or customer lists.  Mr. Imperio was exclusively responsible for the sales and marketing associated with Pharma, and neither Nature nor Mr. Islam had any role in such marketing or customer relationships. Most, if not all of the customers who may have been associated with Pharma were easily and readily accessible in the public domain or by attending trade shows.

10.      Plaintiffs are under a Consent Decree permanently enjoining them from, *inter alia*, manufacturing, selling, packaging nutraceutical products, and requiring Plaintiffs to recall all products sold since January 1, 2013.  As such, Plaintiffs cannot claim damages resulting from lost sales, competition, alleged harm to reputation, trademarks, or otherwise.

11.      Plaintiffs have laid off substantially all of their employees and have ceased to do business.  Accordingly, Plaintiffs cannot enforce the non-compete agreements, claim tortious

interference with existing or prospective contractual relations, or otherwise assert claims for unfair competition or business injury.

12.    Plaintiffs' defamation claims fail, as Plaintiffs have signed a Consent Decree acknowledging that Nature's products were adulterated, misbranded, mislabeled, and unapproved new drugs, and have been permanently enjoined by the FDA from, *inter alia*, manufacturing, selling, packaging nutraceutical products.

13.    Defendants raise each and every defense available to them under the applicable laws of the State of New York.  Defendants reserve the right to raise additional defenses.

## <u>COUNTERCLAIMS</u>

1. In 2016, Nature was a failing company, with $3 million in debt and $4 million in annual sales.

2. Nature had very little sales or marketing capacity in-house, and relied almost entirely on third party companies to generate sales for its products.

3. Prior to 2016, Nature depended mostly on Makers Nutrition, LLC ("Maker's") to deliver it customers for its nutraceutical products.

4. This approach had led Nature to the brink of insolvency, when Maker's ceased referring it sales leads.

5. Mr. Imperio was a Partner and Sales Controller at Makers. Jahirul Islam ("Islam"), the owner of Nature, solicited Mr. Imperio to form a sales and marketing company to sell Nature's products.

6. In or around March 2016, Mr. Imperio and Islam entered into a written agreement, whereby Mr. Imperio became a 50% shareholder of Pharma, along with Islam.

7. At all relevant times, Mr. Imperio was the President of Pharma. Although he ceased working at Pharma on July 23, 2019, he was never formally relieved of his title.

8. Mr. Imperio also entered into a profit-sharing agreement with Nature, whereby Mr. Imperio was entitled to payment of an additional 30% of the profits of Nature (the "Letter of Understanding"). Mr. Imperio never received any payments of Nature's profits under the Letter of Understanding.

9. Pharma and Nature entered in a master supply and purchasing agreement, whereby Pharma sold various nutraceutical products sourced from and/or manufactured by Nature directly to businesses.

10.     As a result of Mr. Imperio's sales and marketing efforts through Pharma, including the selection and creation of various domain names and social media assets that he and his employees registered, themselves, Nature's sales grew from $4 Million in 2015 to $22 million in 2018.

11.     Indeed, in public court filings in an unrelated case, Pharma *and* Mr. Islam, both acknowledged (a) Mr. Imperio's role as president of Pharma, (b) that Mr. Imperio was exclusively responsible for the sales and marketing associated with Pharma, and that neither Nature nor Mr. Islam had any role in such marketing or customer relationships, and (c) importantly, that most, if not all of the customers who may have been associated with Pharma were easily and readily accessible in the public domain or by attending trade shows (which Mr. Imperio did).

12.     Specifically, Mr. Islam alleged, in relevant part, as follows:

> 3.     Pharma was incorporated on March 11, 2016. It is a distributor of vitamin supplements and nutraceuticals, and custom fills orders based on customers' specifications. It also labels, ships and fills orders placed oy brokers. **Frank Cantone is President of ABH Pharma, and is primarily responsible for sales and marketing. My primary function is to oversee the manufacturing process**. I also oversee and supervise the shipping and delivery functions of the business. **Presently, I am unaware of most of Pharma's customers, as I am not involved in finding them or maintaining the relationships with them**.

> 4.     I also own ABH Nature, Inc., (hereinafter "Nature") which has been in business for nearly twenty two (22) years, since 1995, manufacturing vitamin supplements and nutraceuticals. Nature is a full service, large scale operation, complete with its own testing facilities, laboratory, and production area. Nature had always also maintained a small sales force.

> 5.     *     *     * **While Nature maintained a small sales force, it hired Makers and other companies to also find its customers**.

> *     *     *

2

9.      By approximately April, 2016, Nature had almost ceased receiving business referrals from Makers.  The business Nature did receive from Makers was given through ABH Pharma, specifically through Frank Cantone.

*      *      *

16.      **I am not aware of the names of all the companies with whom Pharma currently does business, as I am not involved in the sales aspect of the [business].**
(emphasis added)

13.      In or around early 2018, Mr. Islam made various representations to Mr. Imperio regarding the need for him to temporarily transfer his 50% interest in nominal Plaintiff Pharma, so that Mr. Islam and Nature could apply for and/or secure a bank loan.

14.      Mr. Islam told Mr. Imperio that, unless he could claim *sole* ownership of Pharma, the loan to *Nature* would not be granted.

15.      Upon information and belief, Nature had insufficient assets to obtain the loan on its own.

16.      Thereafter, Nature and its representative, Mr. Islam, made various representations to Mr. Imperio, to induce Mr. Imperio to contribute his shares to Nature without financial remuneration, including a second written agreement ("Second Agreement"), whereby Mr. Islam was to return Mr. Imperio's shares and 50% interest in Pharma in October 2018, at or around the same value.

17.      On July 19, 2018, Mr. Imperio signed an agreement purporting to convey 50 shares of his stock in Pharma to Islam (the "Agreement").

18.      Mr. Imperio simultaneously signed the Second Agreement, pursuant to which those shares were to be returned.  Mr. Islam countersigned the agreements.

3

19.     Upon its execution, Steven Gaskowitz, the CFO of Nature ("Gaskowitz"), took possession of the original of the Second Agreement, claiming that no one could possess a copy for bank purposes.

20.     On September 4, 2019, during a recorded conversation outside of the offices of Nature, Mr. Islam acknowledged the existence of the Second Agreement, but stated that it "would not help" Mr. Imperio.

21.     Defendants fear that the Second Agreement has now been shredded.   Upon information and belief, on or about Friday, November 8, 2019, Islam directed one of his employees to shred incriminating corporate documents.   The employee spent the entire day shredding documents, and then was fired.

22.     Indeed, in addition to the above, Mr. Imperio owned 100 shares of Pharma.   The Agreement only purported to transfer 50 shares.   He never relinquished all of his interest in Pharma at any time, and, in any event, he never intended the transfer of any shares to be permanent.

23.     Tellingly, the prescribed price for Mr. Imperio transferring 25% (or 50% as Plaintiffs argue) of the ownership interest in a company with annual sales of $22 million (in 2018), was fifty dollars – which Islam never paid.

24.     Islam now claims, after the fact and without any proof, that on or about July 19, 2018, he traded his 50% interest in Future Pack Fulfillment, Inc. ("Future Pack") to Mr. Imperio, in exchange for Mr. Imperio's shares in Pharma.   Nowhere in the Agreement is that purported arrangement documented, nor is it reduced anywhere else to writing.

25.     In reality, Islam conveyed his shares in FuturePack to Mr. Imperio in January 2019, to hide his ownership interest from the FDA, after misrepresenting to the FDA in late 2018 that he did not hold an ownership interest in Future Pack.

26.     Islam did not want the FDA to know that he owned 50% of FuturePack, as FuturePack was the signatory on a lease for the warehouse currently occupied by SMP Nutra. At the time, Nature was using the warehouse, in part, to hide certain misbranded, adulterated and unapproved new drugs from FDA inspection.

27.     Nature now denies the existence of the Second Agreement, claiming that the stock transfer was permanent, not temporary.

28.     The Agreement was supposed to be reversed by the Second Agreement after Islam obtained a loan for Nature, but Islam cheated and defrauded his business partner, Mr. Imperio, by denying the existence of the Second Agreement, and claiming that the stock transfer under the Agreement was permanent.

29.     Islam stole Mr. Imperio's shares, seized Pharma's assets, and froze him out of Pharma.

30.     While in possession of Mr. Imperio's shares, Gaskowitz, Islam, and Sahina Islam took control of Pharma's bank accounts and looted them. Islam used corporate funds to defray his own and his family members' personal expenses, and hired family members as "no-show" employees.

31.     For example, Islam misappropriated $450,000 worth of Pharma's inventory, and spent roughly $50,000 of Pharma's money on nutraceutical materials for Nature.

32.     Upon information and belief, Islam spent hundreds of thousands to millions of dollars of Pharma's money on IKEA shopping sprees, machinery purchases for Nature, no-show job payments, a Lamborghini for his son, Bejoy, unauthorized payments to his daughter, Sahina, who was not a Pharma employee, and appliances and kitchen cabinets for his home, among other unapproved expenditures.

5

33.     Islam also shorted Mr. Imperio close to $125,000 in compensation, and stuck him with an IRS tax bill for unpaid corporate taxes in 2017 and 2018 in the amount of $166,000, plus interest and penalties, which Pharma was supposed to pay.

34.     Upon information and belief, Islam diverted at least $400,000 from Pharma to pay Nature's bills.

35.     Upon information and belief, Islam also misappropriated Pharma funds to pay for his home mortgage, the mortgage on Nature's office building, Nature's payroll, and his Porsche. In addition, Islam took distributions from Pharma's assets, for his own personal benefit and to the exclusion of Pharma's co-owner, Mr. Imperio.

36.     Plaintiffs claim that in 2018, "ABH discovered that Imperio opened credit cards without Plaintiffs' knowledge and began to charge massive amounts on the cards for personal expenses," yet this claim was false.  Islam and Nature expressly acknowledged in writing a promise to make payments on those very credit cards, starting in September 2018, which they would not have done if those expenditures had, in fact, been unauthorized.

37.     Contrary to Plaintiffs' claims that Mr. Imperio made improper charges on his credit card, Plaintiffs were fully aware of the charges all along, and had agreed to pay them, as Mr. Imperio was owed millions of dollars in the form of distributions of profits from both Pharma ($50%) and Nature (30%) on roughly $50 million in sales.

38.     In fact, it was precisely *because* neither Nature nor Pharma had paid him profits or compensation that were owed, that Mr. Imperio made personal charges on Pharma credit cards. Despite promising to pay the credit card bills and implement a new compensation plan, Nature never made a single payment.

6

39.     Indeed, when Mr. Islam heard of the amount of the total charges (roughly $250,000), made by Mr. Imperio on the company credit cards, his reaction was of bemusement – "Is that all? I spend much more."

40.     Upon information and belief, Islam stole millions of dollars from Pharma, which belonged to his business partner, Mr. Imperio.

41.     Upon information and belief, by the time that Mr. Imperio's shares were supposed to be returned to him in October 2018, Pharma had few remaining assets.

42.     Islam treated Pharma as his alter ego and personal piggy bank.  He failed to hold meetings, keep corporate books, or adhere to any corporate formalities, caused Pharma to become undercapitalized, commingled company assets with Nature's assets, seized complete control of the corporation, and used corporate funds for his personal benefit and Nature's benefit.

43.     When Mr. Imperio demanded that restitution be made for Islam's brazen acts of theft and corporate looting, Islam stonewalled.  Islam strung Mr. Imperio along, holding out the promise of restitution, but never agreeing to a resolution.

44.     Mr. Imperio stayed on for a time, keeping his title as President of Pharma, in the hopes of reaching a negotiated resolution, as he was owed personally millions of dollars – not counting the value of the shares that Islam fraudulently stole.

45.     Mr. Imperio, however, was also increasingly aware of customer complaints concerning the quality of the products manufactured by Nature.

46.     During Mr. Imperio's time with ABH Pharma, it became increasingly apparent that there were product quality concerns with ABH Nature's dietary supplements.  The following are examples of some of these concerns:

- Capsules made with hygroscopic formulations would not properly encapsulate during the initial run.

- The production staff was instructed by Jahirul Islam to re-process the blend with the addition of silica.  This reprocess was not recorded in the batch production record.  Silica is not always listed as an ingredient in the master manufacturing record or on the finished product label.  The addition of silica created an excessive overage for finished product yield.  The excess product yield was either discarded, reprocessed, or stored in an outdoor trailer.

- ABH Nature manufactured at least four separate lots of supplements, using KSM-66 Ashwagandha.  According to the Website for KSM Ashwagandha, the root of the Ashwagandha is soaked in milk.  Formulations of products and finished product labels do not include milk as an ingredient or an allergen statement for the presence of milk.  Before using the ingredient in these products, ABH Nature was aware that KSM-66 Ashwagandha contains milk.  ABH Nature was also aware that the product was being returned by customers due to allergic reactions.

- ABH Nature was notified by one of their raw material suppliers for MCT oil Powder-FC that the raw material they supplied may be contaminated with a dairy allergen.  To the best of Mr. Imperio's knowledge, ABH Nature took no action to address this.

- On another occasion, a product sample tested positive for salmonella.  ABH ran four additional salmonella tests, which came out negative, but did not report the positive test result to the FDA.

- An entire shipment of Awakened Alchemy ordered by CVS was rejected after it failed CVS's quality test.  The batch had "passed" ABH Nature's internal test.

- Towards the very end of Mr. Imperio's relationship with Nature, he became aware that Mr. Islam employed a tester who could manipulate results to get anything to pass.

The DOJ Letter

47.  In May 2019, Jahirul Islam told Mr. Imperio that the DOJ had sent him a letter and proposed permanent injunction by consent decree, and showed him a copy.

48. The letter was alarming – Mr. Islam was terrified – but his daughter Sahina convinced him to sweep it under the rug, so to speak.

49. The letter threatened legal action and the proposed consent decree would have required a recall of all products sold by ABH Nature going back to January 1, 2013.

50. Mr. Imperio was concerned that Pharma was selling product that the FDA had determined should be *recalled*, and based on what he had come to learn in his time working with Nature, he could no longer sell Nature brand products in good conscience.

The Non-Compete Agreements

51. On or about September 7, and September 11, 2018, respectively, Islam induced Mr. Milano and Mr. Imperio to sign non-compete agreements.

52. Given what Counterclaimants now know, Mr. Islam had recently tricked Mr. Imperio into allegedly transferring him all his shares in Pharma, yet Mr. Imperio believed at

the time that he signed his non-compete agreement and asked Mr. Milano to do the same, that he was going to get his shares back.

53. Mr. Imperio believed that he was signing the non-compete agreement *as an owner* of Pharma, and not as a former owner, whose ownership interests had been swindled and company looted behind his back.

54. Counterclaimants also now know that Nature was selling illegal products, and conducting a largely illegal business.  Despite its protestations and unsubstantiated claims to the contrary, Nature was a repeat and unrepentant violator of FDA regulations.  Nature hid these facts from Mr. Imperio and the rest of the staff at Pharma.

55. Nature denied the existence of an FDA investigation, and claimed good relations with the FDA, as recently as the hearing on its motion for a TRO on October 18, 2019.  Yet, on or about November 8, 2019, the DOJ sent Nature a second Letter and proposed Consent Decree, which has since been signed by Islam and filed with the United States District Court for the Eastern District of New York.

56. Upon information and belief, after receiving the most recent DOJ letter, Nature laid off most of its employees, including all production staff, and all-but-one of its sales staff.

57. As demonstrated above, Nature had unclean hands, and it was Nature's own misconduct that precipitated the rupture with Mr. Imperio and Mr. Milano, and caused them to form a new company.

58. Additionally, Mr. Imperio and Mr. Milano were owners and employees of Pharma, respectively, at the time that they signed the non-compete agreement, and neither received any additional payment or benefit for doing so.

59. Mr. Milano started working for Pharma in March 2016, and Mr. Milano joined Pharma on June 15, 2018.  The non-competes were not signed until September 2018 – notably, one month before Mr. Imperio was supposed to get his shares back pursuant to the Second Agreement.

60. Upon information and belief, Islam induced Mr. Imperio to sign the non-compete as a part of his scheme to steal Mr. Imperio's shares in Pharma and to freeze him out of the company.  Islam sought to box Mr. Imperio into a corner, so that after Islam denied the existence of the Second Agreement, Mr. Imperio could not simply leave, form a new company, and compete against him.

61. Nature's practices violate FDA regulations and could even be criminal.  Nature should not be able to enforce a non-compete agreement against former owners and employees of Pharma – a sales and marketing company dedicated to the sale of Nature's products – when Nature is under a Consent Decree prohibiting it from selling such products.

62. For these reasons and others, Defendants seek a declaration that the non-compete agreements that Mr. Imperio and Mr. Milano signed are unenforceable.

The FDA Investigation

63. On September 4, 2019, two FDA investigators visited SMP Nutra's facility to conduct an inspection.  The following day, there were three.

64. They spent roughly three weeks at SMP Nutra's office, taking an inventory of everything that Nature had stashed in their warehouse.

11

65. It became evident that many of the products in SMP Nutra's warehouse had been hidden there to keep the FDA from inspecting them during an inspection of ABH Nature's facility in January 2019. ABH Nature had repeatedly denied to the FDA that it had another warehouse.

66. The FDA investigators took photographs of every Nature product in SMP Nutra's warehouse, and also took some samples for testing. Both at the start of and following the conclusion of the investigation, Counterclaimants were told not to release any Nature products from their facility. Counterclaimants have since been instructed to hold the products and materials for destruction by Nature, under FDA supervision.

67. As stated above, upon information and belief, on November 8, 2019, the FDA served Nature with a second proposed Consent Decree, barring Nature from selling nutraceutical products, and ordering a recall of all ABH products going back to 2013.

68. Following receipt of this more forceful demand, Nature laid of its production staff and most of its sales force. Nature signed the Consent Decree – which requires a recall of all products sold since January 1, 2013, and permanently enjoins Nature, Islam or related companies from, *inter alia*, manufacturing, selling, packaging nutraceutical products, unless or until they satisfy the FDA that they have met the terms of the Consent Decree. The Consent Decree was filed with the United States District Court for the Eastern District of New York on November 22, 2019.

The Ongoing Defamation

69.    Since Defendants left to operate SMP Nutra, Islam, Sahina Islam, Gaskowitz and Mercurio have engaged in an aggressive defamation campaign against Defendants.

70.     Defendants have asked multiple times that Plaintiffs stop defaming them, to no avail.

71.     Among other false claims, in August 2019, Plaintiffs blasted a link to the following notice to customers, by email, and posted the following notice on their Website:

IMPORTANT INFORMATION BELOW:

1. Our domain address was stolen by an ex-employee

2. The ex-employee now is attempting to impersonate our company and employees and defame our company.

3. The ex-employee has rerouted our email addresses to his personnel and will be attempting to reach out to clients and fabricate information about ABH.

72.     That notice was never taken down, despite repeated requests that it be done, and it is still accessible by link.

73.     Islam and Sahina Islam instructed Nature's employees that the DOJ Letter and consent decree did not concern Nature's products, and directed them to communicate the same to customers.  They further directed employees and sales staff to tell customers that there was no ongoing FDA investigation, and that Defendants were "holding their products hostage."

74.     On November 4, 2019, Michael Mercurio emailed a customer the following notice:

> Please note, we are a direct manufacture and include all testing (mico, identity, heavy metals, potency) with our pricing, and place our clients under our $5 million dollar liability policy as additionally insured.  If you were considering SMP for this order, they have no GMP Certificate, FDA Registration, Insurance Policy, or manufacturing equipment.  Not to mention, was served a court order 2 weeks ago along with a cease and desist, and had to appear in court where we submitted over 50+ pages of further incriminating evidence against them.  They already had to turn over the stolen domain immediately, and will be getting issued the rest of the judges verdicts in the very near future at the next appearance to be completely transparent with you.  If you wanted to hop on the phone with our Lawyer about the matter for further clarification we have no problem doing so for your comfort.
> (emphasis added).

13

75.     The underlined portions of Mr. Mercurio's email are false, misleading and defame Defendants.  Upon information and belief, Mr. Mercurio sent similar emails to numerous customers of SMP Nutra, with the intent to both defame SMP Nutra and also to interfere with SMP Nutra's existing and prospective contracts with its customers, and induce the customers to breach.

76.     On November 12, 2019, in response to a marketing email sent by SMP Nutra to its customers, Mr. Mercurio replied: "This is a spam email from a hacker. Please ignore."

77.      This email was false and defamatory, and was also intended to interfere with SMP Nutra's existing and prospective contracts with its customers, and induce the customers to breach existing contracts.

## FIRST CAUSE OF ACTION
### [Breach of Contract]
### (By Counterclaimant Imperio against Counterdefendant Islam)

78.     Counterclaimant Imperio repeats and incorporates herein by reference each and every one of the allegations contained in paragraphs 1 through 77, with the same force and effect as if set forth in detail herein again.

79.     Counterdefendants breached multiple agreements with Mr. Imperio.

80.     Mr. Imperio was entitled to receive a distribution of 50% of Pharma's profits, as a 50% owner of Pharma, and 30% of Nature's profits, pursuant to a Letter of Understanding with Nature.

81.     Despite over $50 million in sales, Mr. Imperio never received any distribution of profits from either Nature or Pharma.

14

82.    Islam looted Pharma and took all profits of the company for his own benefit.

83.    Islam entered into the Agreement and Second Agreement with Mr. Imperio.

84.    Mr. Imperio entered into the Agreement and the Second Agreement in good faith, under the belief that the Agreement was necessary so that Nature could secure a loan.

85.    Islam took illicit measures to conceal and deny the existence of the Second Agreement, instead of honoring its terms.

86.    Despite acknowledging on September 4, 2019, that a copy of the Second Agreement exists, as referred to above, Islam has breached the Second Agreement and failed and refused to fulfil its terms.

87.    As a result of the non-performance, Mr. Imperio's shares were used to take control of Pharma, and loot its bank accounts.  Islam used corporate funds for his own personal gain.

88.    As a result of these breaches, Mr. Imperio suffered extensive economic harm in an amount to be determined at trial, but in no event less than $5,000,000.

## SECOND CAUSE OF ACTION
### [Fraud]
### (By Counterclaimant Imperio against Counterdefendant Islam)

89.    Counterclaimant Imperio repeats and incorporates herein by reference each and every one of the allegations contained in paragraphs 1 through 77, with the same force and effect as if set forth in detail herein again.

90.     As stated above, Counterdefendant Islam induced Mr. Imperio to enter into the Agreement, under the guise that his shares in Pharma would be returned to him pursuant to the Second Agreement.

91.     Islam, in fact, had no intention of returning Mr. Imperio's shares to him.

92.     Islam took possession of the Second Agreement "for bank purposes," and then wrongfully denied its existence.

93.     Mr. Imperio relied on Islam's representations that his shares would be returned to him, pursuant to the Second Agreement.  Acting on such reliance, Mr. Imperio signed the Agreement, which transferred his shares in Parma to Islam.

94.     Once in control of Pharma, Islam looted the company, treating it as his and Nature's personal piggy bank.

95.     In furtherance of his fraud, after inducing Mr. Imperio to sign the Agreement, but before he was supposed to receive his shares back, Islam also induced Mr. Imperio and Mr. Milano to sign purported non-compete agreements.

96.     Upon information and belief, Islam did this in an effort to prevent Mr. Imperio and Mr. Milano from competing against him once they learned of his fraud.

97.     As a result of Islam's fraud, Mr. Imperio suffered damages under law, in an amount to be determined at trial, but in no event less than $5,000,000, plus punitive damages.

**THIRD CAUSE OF ACTION**
**[Conversion]**
**(By Counterclaimant Imperio against Counterdefendants)**

98.     Counterclaimant Imperio repeats and incorporates herein by reference each and every one of the allegations contained in paragraphs 1 through 77, with the same force and effect as if set forth in detail herein again.

99.     Mr. Imperio owned 50% of Pharma's shares at the time that Islam embarked on his fraudulent scheme.

100.     As 50% owner of Pharma's shares, Mr. Imperio was also the owner of 50% of Pharma's assets, including, without limitation, revenues, profits, materials, intellectual property, domain names, Web site, and customer lists and other assets (the "Assets").

101.     Islam deprived Mr. Imperio of the use, enjoyment, and control of his Assets by exercising exclusive dominion and control over them.

102.     Islam has refused repeated requests that Islam return to Mr. Imperio his shares and/or his share of the Assets.

103.     As such, Mr. Imperio is entitled to damages under law, in an amount to be determined at trial, but in no event less than $5,000,000.

## FOURTH CAUSE OF ACTION
### [Common law Unfair Competition]
### (By Counterclaimants against Counterdefendants)

104.     Counterclaimants repeat and incorporate herein by reference each and every one of the allegations contained in paragraphs 1 through 77, with the same force and effect as if set forth in detail herein again.

105.     As set forth above, Islam and Nature have repeatedly defamed and disparaged Counterclaimants, by email, on Nature's Web site, and in emails and conversations with customers.

106.     While under investigation by the FDA, Islam and Nature falsely denied the existence of such investigation to their own and Counterclaimants' customers, accused Counterclaimants of fabricating the investigation, falsely accused them of hijacking Nature's materials and products, told customers that Counterclaimants were unlicensed and lacked relevant certifications, and told customers that Counterclaimants were about to be shut down, among other misrepresentations.

107.     Such unlawful interference with Counterclaimants' business constitutes unfair competition.

108.     As such, Counterclaimants are entitled to damages under law in an amount to be determined at trial, but in no event less than $1,000,000.

### FIFTH CAUSE OF ACTION
### [Declaratory Judgment (non-competes not enforceable)]
### (By Counterclaimants Imperio and Milano against Counterdefendants)

109.     Counterclaimants Imperio and Milano repeat and incorporate herein by reference each and every one of the allegations contained in paragraphs 1 through 77, with the same force and effect as if set forth in detail herein again.

110.     A justiciable controversy exists between Counterclaimants Milano and Imperio, on the one hand, and Counterdefendants, on the other, with regard to the non-compete agreements.

111.    Mr. Imperio and Mr. Milano were fraudulently induced to sign the non-compete agreements by Counterdefendants.

112.    The non-compete agreements are in the name of "ABH."  ABH is not a defined term in the non-compete agreements, and is not the name of a legal entity owned by Islam, or any other party.

113.    Nature was not listed as a party to the non-compete agreements.  As such, Nature lacks standing to enforce them.

114.    Pharma was not listed as a party to the non-compete agreements.  As such, Pharma lacks standing to enforce them.

115.    At the time that Islam fraudulently induced Mr. Imperio and Mr. Milano to sign the non-compete agreements in September 2018, Nature was selling illegal products and conducting a largely illegal business in violation of numerous FDA regulations.

116.    Nature had been investigated and warned by the FDA over its violations on at least several occasions dating back to 2012.  Nature hid this fact from Counterclaimants.

117.    Nor should Pharma – a company whose ownership interests were fraudulently stolen from Mr. Imperio by Islam – be able to enforce a non-compete agreement against its former owners and employees, when Islam and his companies have been repeatedly asked to stop selling adulterated, mislabeled and unapproved new drugs by the FDA.

118.    Counterdefendants have now been "permanently restrained and enjoined" from "receiving, manufacturing, preparing, packing, repacking, labeling, holding, or

19

distributing any articles of food (including but not limited to dietary supplements and their components," unless or until Counterdefendants meet certain conditions prescribed by the Consent Decree.

119.    The non-compete agreements were amended by Mr. Imperio, acting in his capacity as President of Pharma, to void the non-compete, non-solicitation, and non-disclosure terms.

120.    The non-compete agreements are also overly broad in scope, and were not supported by any consideration at the time that they were signed.

121.    Upon information and belief, Counterdefendants have laid off substantially all of their employees, are selling off equipment, and have placed their headquarters in Edgewood, NY, for lease.

122.    In other words, Counterdefendants have ceased to conduct business.

123.    For these reasons and others, Counterclaimants seek a declaration that the non-compete agreements are unenforceable.

## SIXTH CAUSE OF ACTION
### [breach of fiduciary duty]
### (By Counterclaimant Imperio against Counterdefendant Islam)

124.    Counterclaimant Imperio repeats and incorporates herein by reference each and every one of the allegations contained in paragraphs 1 through 77, with the same force and effect as if set forth in detail herein again.

125.    Mr. Imperio and Mr. Islam were equal shareholders in Pharma, a relationship whereby there existed fiduciary obligations.

126.    Counterdefendant Islam's actions, as referenced above, display a complete disregard for even the most basic notions of "fiduciary duty." Islam has lied,

stolen, and induced Mr. Imperio into sham agreements, all in furtherance of a scheme to

freeze out his business partner and usurp Mr. Imperio's 50% ownership interests in a

sales and marketing business that Mr. Imperio built almost entirely on his own.

127.    Islam breached his fiduciary duty to Mr. Imperio long before he claims

that Mr. Imperio breached his fiduciary duty to Islam.  Indeed, any acts taken by Mr.

Imperio that are alleged to be inconsistent with his fiduciary duty to Islam were taken

*after* Islam failed to pay Mr. Imperio profits, fraudulently induced Mr. Imperio to sell

50% of a $22 million/year business for $50, refused to acknowledge the existence of the

Second Agreement, and froze him out of Mr. Imperio's own company, while looting its

assets for his own and his family's personal gain.  The $50 was never even paid, as it

was not intended as a real transaction.

128.    As a result of Counterdefendant's actions herein, an accounting is

necessary to calculate the adequacy of damages sustained by Mr. Imperio.

129.    As a result, Mr. Imperio is entitled to damages in an amount to be

determined at trial and his attorneys' fees, as well as punitive damages for Mr. Islam's

willful misconduct.

## SEVENTH CAUES OF ACTION
### [violation of BCL section 720(a)(1)(B)]
### (By Counterclaimant Imperio against Counterdefendant Islam)

130.    Counterclaimant Imperio repeats and incorporates herein by reference

each and every one of the allegations contained in paragraphs 1 through 77, with the

same force and effect as if set forth in detail herein again.

131.    Mr. Imperio and Islam were both shareholders of Pharma.

125.     Starting at the company's inception in March 2016, Mr. Imperio was the President of Pharma.

126.     Upon fraudulently acquiring control of Mr. Imperio's shares and Pharma's bank accounts, Islam used Pharma's bank account as his personal piggybank.

127.     Islam spent Pharma's funds lavishly on his own personal expenses, and on his children, paying them directly out of Pharma's bank accounts for no-show jobs and compensation not related to employment by Pharma.

128.     Islam even gave his son, Bejoy – who did not even work at Pharma or Nature – a Lamborghini.  The sports car had originally been leased by Pharma for Mr. Imperio's use, as the owner and President of Pharma.

129.     Upon information and belief, Islam looted Pharma of millions of dollars in assets and profits, including using Pharma to pay Nature's payroll and other business expenses.

130.     As a direct result of Islam's actions, Pharma's funds were entirely wiped out, and Mr. Imperio suffered significant economic, emotional, and reputational harm.

131.     As such, the unlawful conveyance of Pharma's funds should be set aside, and the funds should be restored to Pharma's accounts.

**EIGHTH CAUSE OF ACTION**
**[Common Law Defamation and Trade Libel]**
**(By Counterclaimants against Counterdefendants)**

132.     Counterclaimants repeat and incorporate herein by reference each and every one of the allegations contained in paragraphs 1 through 77, with the same force and effect as if set forth in detail herein again.

133.     Counterdefendants have intentionally made knowingly false statements of fact about counterclaimants to customers and other industry personnel.

134.    The aforementioned statements were false when made and Counterdefendants knew or should have known the statements were false when made.

135.    These statements were made maliciously and willfully, and were intended to cause harm to Counterclaimants' personal and business reputation.

136.    The statements were made with reckless disregard for their truth or falsity or with knowledge of their falsity and with wanton and willful disregard of the reputation and rights of Counterclaimants.

137.    The aforementioned statements were made of and concerning Counterclaimants, and were so understood by those who read or heard Counterdefendant's publication of them.

138.    All of the false and defamatory statements were made without counterclaimants' permission or authorization, nor any justifiable privilege, all of which is embarrassing, humiliating, harassing and distressing.

139.    As a result of Counterdefendant's past and continued wrongful acts, Counterclaimants have endured severe emotional distress and suffered damages in an amount to be proved at trial, including compensation for Counterclaimant's time, effort and attorney's fees.


### NINTH CAUSE OF ACTION
### [Tortious Interference with Prospective Economic Advantage]
### (By Counterclaimants against Counterdefendants)

140.    Counterclaimants repeat and incorporate herein by reference each and every one of the allegations contained in paragraphs 1 through 77, with the same force and effect as if set forth in detail herein again.

23

141.    Counterclaimants had economic relationships with numerous third party customers and prospective customers, which Counterclaimants developed through their own efforts.

142.    Counterdefendants had knowledge of the existence of these relationships.

143.    Upon information and belief, Counterdefendants intentionally disrupted such relationships by engaging in an aggressive defamation campaign against Counterclaimants.

144.    The defamation campaign was intended to disrupt, and did disrupt, both existing and prospective contracts.

145.    Counterdefendants intended to interfere with Counterclaimants' existing and prospective contracts with their customers, and to induce the customers to breach existing contracts.

146.    Counterdefendants, in fact, induced third parties to breach their contracts with Counterclaimants, and to not place new orders with Counterclaimants.

147.    As a result of Counterdefendants' actions, Counterclaimants suffered damages in the form of lost profits from sales and untold losses from the disruption of Counterclaimants' professional and business relationships, in an amount to be proven at trial, but in no event less than $1,000,000.

## **PRAYER FOR RELIEF**

WHEREFORE, Defendants pray that this Court enter a judgment as follows:

1.    Dismissing the SCAC with prejudice, entering a judgment in favor of Defendants;

2.      Awarding Defendants costs of suit incurred in defense of this action, including its reasonable attorneys' fees;

3.      Awarding judgment against Counterdefendant Islam, for actual and compensatory damages resulting from Plaintiff's breach of contract, in an amount to be determined at trial, but no less than $5,000,000.00 (five million dollars), along with interests, costs and such other and further relief as justice requires.

4.      Awarding judgment against Counterdefendant Islam for actual and compensatory damages resulting from Plaintiff's illicit conversion, in an amount to be determined at trial, but no less than $5,000,000.00 (five million dollars), along with interests, costs and such other and further relief as justice requires.

5.      Awarding judgment against Counterdefendants for unfair competition, for an amount to be determined at trial, but no less than $1,000,000.00 (one million dollars), along with interests, costs and such other and further relief as justice requires.

6.      Awarding declaratory judgment against Counterdefendants, affirming that the non-compete agreements are unenforceable.

7.      Awarding judgment against Counterdefendants for Breach of Fiduciary Duty, in an amount to be determined at trial, along with punitive damages for Counterdefendants' willful misconduct.

8.      Restoring funds unlawfully conveyed from Pharma's bank accounts as a result of Islam's misconduct

9.      Awarding judgment against Plaintiffs resulting from Counterdefendants' defamation and trade libel, in an amount to be proven at trial.

10.    Awarding judgment against Counterdefendants, in tortious interference with present and prospective economic advantage, for injunctive relief, compensatory, and punitive damages, in the amount of $1,000,000.00 (one million dollars), along with interests, costs and such further relief as justice requires.

11.    For such further and other relief as the Court may deem just and proper.

Dated: Brooklyn, New York
       November 27, 2019

                                        LEWIS & LIN, LLC

                                        By: _/s/ Brett Lewis_____

                                        Brett E. Lewis, Esq. (BL-6812)
                                        Justin Mercer, Esq. (JM-4514)
                                        81 Prospect Street, Suite 8001
                                        Brooklyn, NY 11201
                                        Tel: (718) 243-9323
                                        Fax: (718) 243-9326
                                        Email: brett@iLawco.com
                                               justin@iLawco.com

                                        *Counsel for Defendants / Counterclaimants*

26