UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

ABH NATURE'S PRODUCTS, INC. and ABH
PHARMA, INC.,

                       Plaintiffs,

             -against-

SUPPLEMENT MANUFACTURING PARTNER,
INC. d/b/a SMP NUTRA, FUTURE PACK
FULFILLMENT, INC., JOSEPH IMPERIO, alias
FRANK CANTONE, STEVEN MILANO,
WILLIAM CARTWRIGHT and JOHN DOES Nos.
1-10,

                      Defendants.

**MEMORANDUM AND ORDER**
19-CV-5637 (LDH) (JRC)

---

LaSHANN DeARCY HALL, United States District Judge:

      ABH Nature's Products, Inc. ("ABH Nature's") and ABH Pharma, Inc. LLC ("ABH

Pharma") (collectively, "Plaintiffs") bring the instant action against Supplement Manufacturing

Partner, Inc., d/b/a SMP Nutra ("SMP"), Future Pack Fulfillment, Inc. ("Future Pack"), Joseph

Imperio ("Imperio"), alias Frank Cantone, Steven Milano ("Milano"), William Cartwright

("Cartwright") and John Does Nos. 1-10 (collectively, "Defendants"), asserting claims for False

Designation of Origin, False Advertising, and Unfair Competition in violation of 15 U.S.C. §

1125(a), and claims under New York law for trademark infringement, common law unfair

competition, breach of fiduciary duty and implied covenant of good faith and fair dealing, unjust

enrichment, breach of duty of loyalty, tortious interference with contract, existing and

- 1 -

prospective business relationships, and breach of contract.[1]  Defendants move pursuant to Rule 56 of the Federal Rules of Civil Procedure for summary judgment to dismiss the complaint in its entirety.

## UNDISPUTED FACTS[2]

Jahirul Islam ("Islam") was the sole owner of ABH Nature's, a nutraceutical manufacturing company he founded between 1994 and 1995.  (Pls.' Resp. to Defs.' Rule 56.1 Stmt. ("Pls.' Resp. 56.1), ¶ 1, ECF No. 69.)  In or around March 2016, Joseph Imperio and Islam entered into a series of agreements to form ABH Pharma, a nutraceutical sales and marketing company, whereby Imperio and Islam each owned 50% of the company.  (*Id.* ¶¶ 2–3.)  Imperio served as the President of ABH Pharma, where he was primarily responsible for ABH Pharma's sales and marketing.  (Pls.' Resp. 56.1 ¶¶ 3, 6.)  According to Imperio, he and his sales staff developed customer lists entirely through their own efforts, as well as customer service and marketing departments.  (Pls.' Resp. 56.1 ¶¶ 6; Lewis Decl. Ex. G ¶ 18, ECF 64-8.)  Islam's primary function at ABH Pharma was to oversee the manufacturing process.  (Pls.' Resp. 56.1¶ 7.)  Islam otherwise did not have a role in marketing or sales, although he knew software existed to search marketing company information, and he was unaware of the names of all the companies ABH Pharma did business with.  (*Id.* ¶¶ 6–7.)  Furthermore, Islam was unaware of most of ABH Pharma's customers because he was not involved in finding or maintaining relationships with them.  (*Id.* ¶¶ 6–7.)

---

1 Plaintiffs voluntarily stipulated and agreed to dismiss their fourth, seventh, ninth, tenth, twelfth, thirteenth, fifteenth, and sixteen claims.  (ECF No. 60.)

2 The following facts are taken from the parties' statements of material fact pursuant to Local Rule 56.1 and annexed exhibits.  Unless otherwise noted, the facts are undisputed.

In or around 2016, ABH Nature's and ABH Pharma entered into a master supply and purchasing agreement that allowed ABH Pharma to sell certain nutraceutical products at set prices sourced from and/or manufactured by Nature to different businesses.  (Pls.' Resp. 56.1 ¶ 4.)  By 2018, ABH Pharma generated approximately $18 million in gross revenue.  (Pls.' Resp. 56.1 ¶ 5.)  In the summer of 2018, Imperio signed a Share Purchase Agreement, which purported to transfer his 50% interest in ABH Pharma to Islam for a purchase price of $50.  (Pls.' Resp. 56.1 ¶¶ 8–9.)

Sometime between August and September 2018, Imperio and his sales team signed non-compete agreements with ABH.  (Pls.' Resp. 56.1 ¶ 36; Milano Decl. at Exhs. GG and HH.)  The non-compete agreements bar the signatories from working in the nutraceutical industry for two years after leaving ABH and contain no territorial restriction.  (Pls.' Resp. 56.1 ¶ 39.)

On or around May 10, 2019, Islam informed Imperio that the United States Department of Justice ("DOJ") sent him a letter informing him that the United States Food and Drug Administration ("FDA") had advised the DOJ that ABH Nature's and ABH Pharma's products violated several FDA regulations, and that the FDA referred the matter to the DOJ for potential legal action to, among other things, obtain a permanent injunction against both entities.  (Pls.' Resp. 56.1 ¶¶ 1415.)  The letter also attached a proposed consent decree which by its terms would require ABH to "recall and destroy, under FDA's supervision . . . all dietary supplements" that were received, manufactured, prepared held or distributed dating back to January 1, 2013.  (Milano Declaration, Ex. DD at 10,  ECF No. 65-.)  Islam also showed Imperio copies of the documents. (Pls.' Resp. 56.1 ¶ 14.)

Sometime in June 2019, Imperio, Milano, and Cartwright formed SMP Nutra, with an inventory based on private label contract manufacturer for dietary supplements.  (Pls.' Resp. 56.1

¶ 17)  The next month, Imperio, Milano, and Cartwright left ABH Pharma and Imperio was

installed as SMP Nutra's CEO.  (Defs.' Reply 56.1 ¶ 17.)  At about this same time, SMP Nutra

hired former ABH Pharma employes David Silvia and Louis Sanchez.  (*Id.* ¶ 5.)  Additionally,

Defendants extended job offer on July 23, 2019, to BH ABH Nature's Chief Operating

Officer/General Manager Kyle McCurry.  (*Id.* ¶ 6.)

Before Cartwright left ABH Pharma for SMP Nutra, Cartwright downloaded ABH

Pharma's "lead list", using his password to access the "HubSpot database".  (Pls.' Resp. 56.1 ¶¶

50–51.)  The lead list was a list of "potential customers who showed interests" and were "not

customers yet."  (Lewis Decl. Ex. N 81:19–25.)  Although the parties dispute who was permitted

to access the lead list, according to Cartwright, "anybody" was permitted to enter data into the

lead list database.  (*Id.* 82:15–23.)  Additionally, when Imperio, Milano and Cartwright left ABH

Pharma, Imperio communicated to some of ABH Nature's customers that there was a DOJ letter

and consent decree.  (Pls.' Resp. 56.1 ¶ 18; Monroe Decl. Ex. H.)

On or around August 28, 2019, Imperio directed Cartwright to redirect ABH Pharma's

Domain Name "abhpharma.com" to the website "smpnutra.com".  (Pls.' Resp. 56.1 ¶¶ 42, 43;

Lewis Decl. at Ex. K 63:12–64:6.)  Abhpharma.com was redirected to smpnutra.com for

approximately two months until October 22, 2019.  (Pls.' Resp. 56.1 ¶ 44; Lewis Decl. Ex. U.)

During that time, 133 users who tried to access abhpharma.com were redirected to SMP Nutra's

website, and of those 133 visitors, two submitted inquiries and neither customer who submitted

an inquiry placed an order.  (Pls.' Resp. 56.1 ¶¶ 45–47; Milano Decl. Ex. KK; Ex. II.)

In November 2019, the FDA shut down ABH Nature's operations.  (Pls.' Resp. 56.1 ¶

19.)  On November 21, 2019, Plaintiffs signed a Consent Decree on behalf of himself, ABH

Pharma, ABH Nature's, and StockNutra.com, Inc.  (Pls.' Resp. 56.1 ¶¶ 20, 28; Lewis Decl. Ex.

E, ECF No. 64-5.)  The Consent Decree prohibited Plaintiffs from engaging in the nutraceutical business (unless certain stringent conditions were met) and requires them to recall all products manufactured since January 2013 and destroy them.  (Pls.' Resp. 56.1 ¶ 30; Lewis Decl., Ex. E, at 6–8.)  Plaintiffs have not engaged in or operated a nutraceutical business since November or December 2019.  (Pls.' Resp. 56.1 ¶ 30.)

Following the signing of the Consent Decree, the FDA arranged for and oversaw the destruction of all ABH Nature's finished products and materials, including those stored at the SMP warehouse.  (Pls.' Resp. 56.1 ¶¶ 32, 35.)

## STANDARD OF REVIEW

Summary judgment must be granted when there is "no genuine dispute as to any material fact and the movant[s] are entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).  A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248.  The movants bear the initial burden of demonstrating the absence of a genuine issue of material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 23 (1986); *Feingold v. New York*, 366 F.3d 138, 148 (2d Cir. 2004).  Where the non-movant bears the burden of proof at trial, the movants' initial burden at summary judgment can be met by pointing to a lack of evidence supporting the non-movant's claim.  *Celotex Corp.*, 477 U.S. at 325.  Once the movants meet their initial burden, the non-movant may defeat summary judgment only by producing evidence of specific facts that raise a genuine issue for trial.  *See* Fed. R. Civ. P. 56(e); *see also Anderson*, 477 U.S. at 250; *Davis v. New York*, 316 F.3d 93, 100 (2d Cir. 2002).  The Court is to believe the evidence of the non-movant and draw all justifiable inferences in his favor, *Anderson*, 477 U.S. at 255, but the non-movant must still do more than

merely assert conclusions that are unsupported by arguments or facts.  *BellSouth Telecomms., Inc. v. W.R. Grace & Co.*, 77 F.3d 603, 615 (2d Cir. 1996).

When cross motions for summary judgment are made, the standard is the same as that for individual motions.  *See Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001).  The court must consider each motion independently of the other and, when evaluating each, the court must consider the facts in the light most favorable to the non-moving party.  *Id.*

## DISCUSSION[3]

I. **Lanham Act Claim, Common Law Trademark Infringement Claim and Common Law Unfair Competition Claim**

To prevail on a Lanham Act claim, a plaintiff must "demonstrate[e] that the plaintiff's mark is protected," and "prove that the defendant's use of the allegedly infringing mark would likely cause confusion as to the origin or sponsorship of the defendant's goods with plaintiff's goods."  *Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 588 F.3d 97, 114 (2d Cir. 2009).  Once a violation of the Lanham Act is established, plaintiffs can recover "(1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action."  15 U.S.C. § 1117(a); *see also Louis Vuitton Malletier S.A. v. LY USA, Inc.*, 676 F.3d 83, 108 (2d Cir. 2012) (same); *Grp. Pne Ltd. v. GTE GmbH*, 625 F. Supp 3d. 28, 77 (E.D.N.Y. 2022) (noting that lost profits are recoverable under the Lanham Act and New York common law).

Here, Defendants do not dispute that they redirected the domain name, abhpharma.com, to SMP's website from August 28, 2019, to October 22, 2019.  (Defs.' 56.1 Reply ¶¶ 43–44.) This constitutes a violation of the Lanham Act.  *Lightbox Ventures, LLC v. 3rd Home Ltd.*, 16-

---

[3] Before discussing the merits of the parties' arguments, the Court notes that Plaintiffs put forth very little, if any effort, to dispute most of Defendants' arguments.  Although Plaintiffs ultimately have the burden to prove their claims, Plaintiffs fail to proffer facts that might operate to support their arguments and fail to cite to legal authority to support their arguments.

cv-2379 (DLC), 2018 WL 1779346, *16 (E.D.N.Y. Apr. 13, 2018).  This dispute, however, concerns whether Plaintiffs are entitled to damages as a result of that violation.  On that score, Defendants contend that Plaintiffs are not entitled to any relief.  (Defs.' Mem. at 2–3.)  Plaintiffs argue, to the contrary, that they are entitled to actual damages flowing from Defendants' alleged misconduct.  (Pls.' Opp'n at 12–13.)[4]

A plaintiff's damages award may be in the form of the defendant's profits if the plaintiff provides proof of a defendant's sales.  15 U.S.C. § 1117(a).  Then a court may deduct from that figure proven costs and expenses.  *Id.*; *see also Pedinol ABH Pharma., Inc. v. Rising ABH Pharma, Inc.*, 570 F. Supp. 2d 498, 501–502 (E.D.N.Y. 2008).  With that said, a plaintiff is not "automatically entitled to all of defendant's profits over the time period" of the infringing conduct because that may overcompensate a plaintiff for the actual injury it sustained.  *Pedinol*, 570 F. Supp. 2d at 504.  Instead, courts consider a variety of factors, such as the degree of certainty that the defendant benefitted from the unlawful conduct, the availability and adequacy of other remedies, a defendant's role in effectuating the wrongful conduct, and that plaintiff's laches and unclean hands.  *Id.*; *see also Merck Eprova AG v. Gnosis S.p.A.*, 901 F. Supp. 2d 436, 457 (S.D.N.Y. 2012).

---

[4] Plaintiffs also purport to seek statutory damages pursuant to "15 U.S.C. § 1117(d) for a violation of section 1125(d)(1)" which sets out the elements for cyberpiracy in violation of Anticybersquatting Consumer Protection Act ("ACPA").  (Pl.'s Opp'n at 13.)  However, Plaintiffs did not plead a violation of the ACPA in their complaint and cannot now assert that claim in opposition to Defendants' summary judgment motion.  *See Adamson v. City of New York*, 2019 WL 181299, at *1 (E.D.N.Y. Jan. 10, 2019) ("It is well-settled that it is inappropriate to raise new claims for the first time in submissions in opposition to summary judgment.") (internal quotation marks and citation omitted).  And, the Lanham Act does not otherwise authorize statutory damages for the type of violation Plaintiffs have proven.  *See Lightbox Ventures*, 2018 WL 1779346, at *16 (holding that the Lanham Act does not authorize statutory damages for the infringing use of a domain name); *see also* 15 U.S.C. §§ 1117(c)–(d) (providing for statutory damages for two types of violations: cyberpiracy in violation of ACPA and counterfeiting).  Thus, if Plaintiffs have any avenue for recovery, it can only be through their alternative claim for actual damages under the Lanham Act.

Plaintiffs' argument for actual damages is premised upon SMP Nutra's product sales to fifteen ABH Pharma customers during the time period when the domain name was redirected in the amount of $127,517.24, as well as SMP Nutra's product sales to 22 ABH Pharma customers between July 23, 2019 and November 21, 2019 totaling $542,487.20.  (Pls.' Opp'n at 14.)  Defendants argue that Plaintiffs are not entitled to any monetary relief because Plaintiffs cannot identify any profits or damages caused by the alleged infringement.[5]  (Defs.' Mem. at 7–9; Defs.' Reply Mem. at 2.)  The Court agrees.

By Plaintiffs' own admission, during the period of August 28, 2019 until October 19, 2019, when the domain name "abhpharma.com" was redirected to SMP's website, only 133 visitors were redirected, of those visitors, only two submitted inquiries, and neither of these two visitors placed an order.  (Pls.' 56.1 Opp. ¶¶ 45–47.)  And, Plaintiffs do not otherwise provide evidence that establishes causation between Defendants' profits and SMP Nutra's sales.  Without record evidence showing this causal link, Plaintiffs are not entitled to Defendants' profits.  *Pedinol*, 570 F. Supp. 2d at 504 (noting that a plaintiff is not "automatically entitled to all of defendant's profits over the time period" of the false statements).  *See Burndy Corp. v. Teledyne Indust., Inc.*, 748 F.2d 767, 771 (2d Cir. 1984) (observing that "[a]lthough a court may engage in some degree of speculation in computing the *amount* of such damages, particularly when the inability to compute them is attributable to the defendant's wrongdoing, causation must first be established.")

---

[5] Defendants originally argued in their opening brief that there is no evidence of actual confusion or willful deception giving rise to a presumption of confusion or public harm.  (Defs.' Mem. at 5–6.)  However, Defendants withdrew this argument in their Reply brief.  (Defs.' Reply Mem. at 2.)

For these reasons, Defendants' motion for summary judgment on Counts One, Two and Three are granted.[6]

## II.    Breach of Fiduciary Duty (Count Five)

To successfully prosecute a claim of a breach of fiduciary duty, a plaintiff must prove: "(1) the existence of a fiduciary relationship; (2) misconduct by defendant constituting a breach of its fiduciary duty to plaintiff; and (3) damages to plaintiff directly caused by defendant's misconduct." *Yukos Capital S.A.R.L. v. Feldman*, 977 F.3d 216, 241 (2d Cir. 2020).

Defendants do not contest that Imperio and Plaintiffs had a fiduciary relationship. Defendants argue instead that Plaintiffs' breach of fiduciary duty claim against Imperio fails because Plaintiffs have not adduced any evidence that they incurred damages from Imperio's purported breach.  (Defs.' Mem. 11–12.)[7]  The Court agrees.

As with Plaintiffs' Lanham Act claim, Plaintiff's theory of  damages on their breach of fiduciary duty claim is that Defendants profited from use of ABH Pharma's domain name and SMP Nutra's sales to ABH Pharma customers.  Because the Court has already determined that Plaintiffs have not demonstrated any causal link between Defendants' use of the website domain

---

[6] Defendants contend that Plaintiffs' request for injunctive relief is moot because Defendants returned the ABH Pharma domain name to Plaintiffs by October 22, 2019, almost three years ago.  (Defs.' Mem. at 3.) Defendants further contend that there is no evidence to suggest that Defendants either intend or have the ability to resume using the domain name.  (*Id.*) The Lanham Act also allows a court to issue injunctive relief where a plaintiff succeeds on the merits, there is no adequate remedy at law and an injunction can prevent irreparable harm.  15 U.S.C. § 116.  Perhaps conceding that injunctive relief is not warranted here, Plaintiffs do not respond to these arguments.  Plaintiffs have therefore abandoned their claim for injunctive relief.  *Laface v. Eastern Suffolk BOCES*, 349 F. Supp. 3d 126, 161 (E.D.N.Y. 2018) (collecting cases noting that a party's failure to respond to an argument in a motion to dismiss or for summary judgment is considered an abandonment by that party).  Accordingly, Plaintiff's request for injunctive relief is denied.

[7] Plaintiffs originally raised this claim against Defendants SMP, Milano, Cartwright and Imperio. (Compl. ¶¶ 135–139.)  However, in Plaintiffs' opposition, they concede that all of the Defendants, except for Imperio, did not have a fiduciary duty with Plaintiffs and that this claim can be dismissed against them.  Therefore, the Court only addresses Defendants' argument with respect to Defendant Imperio.

and its sales to former ABH Pharma customers, Plaintiffs cannot establish damages causes by any breach of Defendants' purported fiduciary duty.  Accordingly, Plaintiffs' breach of fiduciary duty claim is dismissed.

## III.   Unjust Enrichment (Count Six)

To establish an unjust enrichment claim in New York, three basic elements must be met: (1) that defendant was enriched, (2) at plaintiff's expense, and (3) equity and good conscience militate against permitting defendant to retain what plaintiff is seeking to recover.  *Diesel Props S.r.l. v. Greystone Business Credit II LLC*, 631 F.3d 42, 55 (2d Cir. 2011).  An unjust enrichment claim is not available if it duplicates, or replaces, a conventional contract or tort claim.  *See Continental Indus. Grp., Inc. v. Altunkilic*, 788 Fed. App'x 37, 43 (2d Cir. 2019).  As Defendants correctly argue, Plaintiffs' unjust enrichment claim should be dismissed because it duplicates their other causes of action sounding in tort and contract.  (Defs.' Mem. at 13.)

In response, Plaintiffs simply state, without any citation to the record, that "Defendants' admitted and undisputed improper conduct and Plaintiff's ability to quantify and establish its damages related to Defendants' conduct," means that they are entitled to damages with respect to unjust enrichment.  (Pls.' Opp'n at 15.)  It is unclear what "improper conduct" Plaintiffs are referring to or whether that conduct is properly disputed.  But, even if the Court were to read Plaintiffs' argument to refer to Defendants' use of abhpharma.com, which Plaintiffs rightly characterize as improper, this claim fails for the same reason Plaintiffs' Lanham act claim fails— there is no evidence that Defendants were enriched by their use of abhpharma.com.

Accordingly, Plaintiffs' unjust enrichment claim is dismissed.

IV.     **Breach of the Duty of Loyalty and Corporate Opportunity (Count Eight)**

The corporate opportunity doctrine "prohibits a corporate employee from utilizing information obtained in a fiduciary capacity to appropriate a business opportunity belonging to the corporation." *Am. Fed. Grp., Ltd. V. Rothenberg*, 136 F.3d 897, 906 (2d Cir. 1998).  This doctrine "applies even after one owing fiduciary duties leaves his corporate employment." *Id.* The corporate opportunity doctrine is "limited, however, to business opportunities in which a corporation has a 'tangible expectancy' which means 'something much less tenable than ownership, but, on the other hand, more certain than a desire or a hope.'" *Id.* (citation omitted).

Plaintiffs allege that Defendants owed a duty of loyalty to Plaintiffs and breached their duty of loyalty by usurping corporate opportunities that belonged to them through the misappropriation of confidential information.  (Compl. ¶¶ 148–152.)  In short, Plaintiff claims that defendants "usurped [a] corporate opportunity." *Epstein Eng'g, P.C. v. Cataldo*, 150 A.D.3d 411, 411–12 (2017).

Fatal to Plaintiffs' contention that Defendants usurped Plaintiffs' corporate opportunities is the fact that Plaintiffs entered a consent decree with the DOJ and shut down its business shortly after Defendants generated business using Plaintiffs' client lists.  (Pls.' Resp. 56.1 ¶¶ 19, 20, 28.)  Therefore, it is plain that Plaintiffs had no "tangible expectancy" of generating business from those customers.  *See Alexander & Alexander of New York, Inc. v. Fritzen*, 147 A.D.2d 241, 248 (N.Y. App. Div. 1st Dep't 1989) (noting that an officer or employee will have violated a fiduciary responsibility where "the consequences of deprivation are so severe as to threaten the viability of the enterprise").  As such, Plaintiffs' breach of the duty of loyalty is dismissed.

V.      **Tortious Interference (Count Eleven)**

Under New York law, a plaintiff must demonstrate the following elements of a tortious interference with contract claim:  (1) the existence of a valid contract; (2) Defendants' knowledge of the contract's existence; (3) that Defendants intentionally procured a contract breach; (4) actual breach of the contract; and (5) that Plaintiffs suffered damages as a result of the interference and subsequent breach.  *Catskill Dev., L.L.C. v. Park Place Entm't Corp.*, 547 F.3d 115, 124–25 (2d Cir. 2008).  To prevail on a claim for tortious interference with prospective business relationships under New York law, a plaintiff must show that:  "(1) the plaintiff had business relations with a third party; (2) the defendant interfered with those business relations; (3) the defendant acted for a wrongful purpose or used dishonest, unfair, or improper means; and (4) the defendant's acts injured the relationship."  *Id.* at 132.

Here, Plaintiffs argue that because of Defendants' wrongful actions, they interfered with Plaintiffs' existing customers and contracts by inducing them to cancel contracts with Plaintiffs and enter into contracts with them.  (Compl. ¶¶ 167–173.)  Defendants argue that Plaintiff failed to produce any evidence of third-party contracts, or Defendants' improper procurement of those contracts through fraud, and fail to adduce evidence of any "business relations" Plaintiffs enjoyed with third parties or that Defendants interfered with them.  (Defs.' Mem. at 16.)  Here again, the Court agrees with Defendants.

The record contains no evidence of contracts of between Plaintiffs and any customers. That alone dooms Plaintiffs claim.  *See Fire Island Real Est., Inc. v. Coldwell Banker Residential Brokerage*, 131 A.D.3d 507, 508 (N.Y. App. Div. 2d Dep't 2015) (dismissing tortious interference with contract claim because "the plaintiff failed to establish that there was a valid

contract between the plaintiff and a third party").  Plaintiffs' tortious interference with contract claim is dismissed.

## VI.     Breach of Contract (Count Fourteen)

A claim for breach of contract under New York law requires the existence of an agreement, plaintiff's performance of the contract, the defendant's breach and damages.  *Wilder v. World of Boxing LLC*, 777 F. App'x 531, 532 (2d Cir. 2019) (summary order citing New York case law).  Plaintiffs argue that because the parties entered into non-compete agreements, Defendants breached those agreements by forming SMP and soliciting customers and employees that competes with ABH.  (Compl. ¶¶ 188–194; Defs.' Mem. at 16–17.)  Defendants counter that the non-compete agreements are not enforceable cause they do not contain geographic limitations or an unreasonable in terms of scope.  (Defs.' Mem. at 17.)

Here, it is undisputed that the non-compete agreements at issue in this case bar the signatories from working in the nutraceutical industry for two years after leaving ABH, and do not contain any territorial restriction.  (Pl.'s Resp. 56.1 ¶ 39.)  Under New York law, an agreement not to compete will be enforced only if "it is reasonable in time and area, necessary to protect the employer's legitimate interests, not harmful to the general public, and not unreasonably burdensome to the employee."  *Reed, Roberts Assoc. v. Strauman*, 40 N.Y.2d 303, 307 (1976).  Courts applying this standard to non-compete agreements without a geographical limitation, like the one here, have found them to be unenforceable.  *See Pure Power Boot Camp, Inc. v. Warrior Fitness Boot Camp*, LLC,  813 F. Supp. 2d 489, 507 (E.D.N.Y. 2011) (finding a non-compete provision unreasonable because, inter alia, it did not provide for any geographic limitations);  *Silipos, Inc. v. Bickel*, No. 06 Civ. 2205(RCC), 2006 WL 2265055, at *6 (S.D.N.Y. 2006) (holding that a restrictive covenant with worldwide restrictions on competition is not

- 13 -

reasonable); *Heartland Sec. Corp. v. Gerstenblatt*, No. 99 Civ. 3694(WHP), 2000 WL 303274, at *7 (S.D.N.Y. Mar. 20, 2000) (refusing to fully, or partially, enforce a non-compete with no geographic limitations); *see also Good Energy, L.P. v. Kosachuk*, 49 A.D.3d 331, 332 (N.Y. App. Div. 1st Dep't 2008) (finding unenforceable a non-compete covenant that covered the entire United States where employer only operated in eight states); *Garfinkle v. Pfizer, Inc.*, 162 A.D.2d 197, 197 (N.Y. App. Div. 1st Dep't 1990) (refusing to enforce a restrictive covenant whose geographic scope "encompasses the entire world").

To be sure, the Court may "blue pencil" the non-compete clause—that is, pare an overbroad restrictive covenant to bring it within reasonable bounds— where appropriate to protect Plaintiffs' legitimate interests. *See S. Nassau Control Corp. v. Innovative Control Mgmt. Corp.*, No. 95–cv–3724, 1996 WL 496610, at *5 (E.D.N.Y. 1996). However, the circumstances appropriate to protect an employer's legitimate interests usually arise in the context of requests for injunctive relief, which demands a different inquiry than a motion for summary judgment. *See Wrap-N-Pack, Inc. v. Eisenberg*, 2007 WL 952069, *7 (E.D.N.Y. Mar. 29, 2007) (observing that "while a court has the discretion to pare or 'blue pencil' a restrictive covenant as to its duration and geographic scope in the context of granting injunctive relief . . . the same is not true in other contexts" such as summary judgment) (internal citations omitted). The undisputed record here presents no facts that would justify the use of the Court's authority to blue pencil the non-compete agreements. As discussed, Plaintiff's business shut down due to its consent agreement with the government. Therefore, Plaintiffs do not have legitimate interests that would

be protected by a pared non-compete agreement at this stage in the litigation.  Plaintiffs' breach

of contract claim is dismissed.

## CONCLUSION

For the aforementioned reasons, Defendants' motion for summary judgment is

GRANTED.


                                            SO ORDERED.

Dated:  Brooklyn, New York                  /s/ LDH_____
        March 29, 2024                      LaSHANN DeARCY HALL
                                            United States District Judge